**Supreme Court**

No. 2011-97-C.A.

(P1/10-683BG)

| State | : |
| --- | --- |
| v. | : |
| Nayquan Gadson. | : |

NOTICE:     This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                 :

v.              :

Nayquan Gadson.       :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Nayquan Gadson, was convicted by a Providence County Superior Court jury of second-degree robbery, and he has appealed from that conviction.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time.  For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.

**I**

**Facts and Travel**

**A.  The Robbery and the Subsequent Charges**

On January 13, 2009, Paul Moran and Joan Kovacs were the victims of a robbery that took place on Georgia Avenue in Providence.  Over a year later, on February 26, 2010, defendant, along with codefendant Michael Stokes, was charged in connection with that robbery

in a multi-count indictment. The defendant and codefendant Stokes, who eventually were tried together, were charged with one count of first-degree robbery in violation of G.L. 1956 § 11-39-1(a) (Count One); two counts of using a firearm while in the commission of a crime of violence in violation of G.L. 1956 § 11-47-3.2(a) (Counts Two & Five); one count of assault with intent to rob in violation of G.L. 1956 § 11-5-1 (Count Three); and one count of conspiracy to commit robbery in violation of G.L. 1956 § 11-1-6 (Count Four). In addition, codefendant Stokes (and he alone) was charged with one count of carrying a handgun without a license in violation of § 11-47-8(a) (Count Six) and one count of discharging a firearm from a motor vehicle in a manner which created a substantial risk of death or serious injury in violation of § 11-47-61 (Count Seven).

### B. The Pre-trial Rulings

Prior to trial, defendant filed a motion to sever the firearms charges pending against codefendant Stokes or, alternatively, to sever his trial from the trial of Mr. Stokes. The state agreed to sever the charge against Mr. Stokes of discharging a firearm from a motor vehicle in a manner which created a substantial risk of death or serious injury (Count Seven); however, the trial justice denied the motion to sever the charge against Mr. Stokes of carrying a handgun without a license (Count Six). The trial justice stated that, even though that charge pertained only to codefendant Stokes, he was satisfied that "the evidence that the same firearm was present among and between [defendants] the day before"[1] was "relevant [and] probative;" he added that "to the extent that there's any prejudice at all, [it was] minimal."

---

[1] The two firearms charges against Mr. Stokes involved actions that related to a discharge of a firearm that allegedly took place on January 12, 2009—the day before the robbery at issue in this case.

- 2 -

The trial justice also denied defendant's motion in limine seeking to preclude the state from introducing any evidence tending to show a connection between defendant and the firearm used by Terrell Judd in the commission of the robbery. (The role of Terrell Judd is explained infra.) The trial justice ruled that such evidence is "part and parcel of the offenses charged and is in no way subject to exclusion."

In due course, a jury trial was held over five days in November of 2010. We summarize below the salient aspects of what transpired at trial.

## C. The Testimony at Trial

### 1. The Testimony of Terrell Judd

The first witness for the state was Terrell Judd, who had pled guilty to several felony charges in connection with the robbery at issue. Mr. Judd pled guilty to one count of first-degree robbery, one count of assault with intent to rob, and one count of conspiracy to commit robbery. He testified pursuant to a "**MEMORANDUM OF AGREEMENT**," according to which the state, in consideration of his testimony, agreed to recommend that concurrent sentences of twelve years imprisonment be imposed, with between three and five years to serve.

According to Mr. Judd's testimony, on January 12, 2009 (the day before the robbery), he, along with defendant and codefendant Stokes, drove to the home of defendant's girlfriend, one Liz Guzman. Mr. Judd testified that Mr. Stokes and defendant went into Ms. Guzman's residence and then returned to the car; he added that later, while the trio was driving around, he observed a chrome revolver with a black handle in the possession of Mr. Stokes. Mr. Judd testified that he thereafter went his separate way; he added that later the same day he saw his two companions in the parking lot at Ms. Guzman's residence, where they were sitting in a gray Nissan Altima that he had never seen before.

Mr. Judd further testified that the next day (January 13) defendant and codefendant Stokes picked him up at his home at approximately 10 a.m. in the same gray Nissan Altima that he had observed on the previous day. Mr. Judd stated that the three men proceeded to drive to defendant's house and that, at defendant's direction, he retrieved from inside the house the gun that he had seen in codefendant Stokes's possession the day before. Mr. Judd identified the gun shown to him at trial as being the one that he used in the robbery.

Mr. Judd further testified that defendant later drove away on his own, after first leaving the gun with him; he added that defendant had said that he thought he recognized someone in another car as being a particular person with whom the three men did not get along. It was Mr. Judd's further testimony that defendant thereafter returned, stating that he had been mistaken about the identity of the person in the other car, but also stating that he had spotted a man and woman who "looked * * * drunk;" Mr. Judd stated that defendant suggested that the three men should "go lick them," and Mr. Judd acknowledged that he understood that expression to mean go "rob" them. Mr. Judd testified that he wanted to carry out the robbery and that defendant "wanted to go" as well, whereas Mr. Stokes was "hesitant," "didn't want to do [the robbery]," and "seemed confused." Mr. Judd stated that he, along with defendant and Mr. Stokes, drove to the next block and parked the Nissan Altima in a driveway. He added that Mr. Stokes remained in the car talking on the phone as Mr. Judd and defendant exited the vehicle.

It was the further testimony of Mr. Judd that, after he and defendant had raised the hoods of their sweatshirts, he went to the side door of the vehicle on the driver's side where Mr. Moran was seated, while defendant went to the side door on the passenger side where Ms. Kovacs was seated. Mr. Judd added that, at that point, defendant engaged in a "tug-o-war[sic]" with Ms. Kovacs in an effort to take a purse. Mr. Judd further testified that, once defendant had the purse

- 4 -

in his possession, he began to run away. At about the same time, according to the testimony of Mr. Judd, he approached Mr. Moran, pointed the gun at his chest, and ordered him out of the car. It was the further testimony of Mr. Judd, however, that Mr. Moran then released a large dog from the car that began to chase him. Mr. Judd stated that he ran back to the Nissan Altima, where he found defendant as well as codefendant Stokes. He added that, after defendant drove the trio in the Nissan Altima to a Shell gas station, defendant handed Ms. Kovacs's purse to codefendant Stokes, who proceeded to remove money from it and then throw it out of the window of the vehicle. The money was then divided among the three occupants of the Nissan Altima.

Mr. Judd further stated that, after the three men left the Shell station and began driving along Interstate 95, they were pursued by the police. He testified that, as a result, the fleeing men drove off the interstate highway while he looked for a good place where he might throw the gun—which he said that he did. Mr. Judd stated that, upon reaching Gordon Avenue, the trio abandoned the vehicle and fled. It was Mr. Judd's further testimony that a police officer thereafter spotted him hiding under another vehicle and proceeded to place him in handcuffs. Mr. Judd explained that he was taken to a nearby "housing unit," where he was identified by the victims. Mr. Judd also showed the police where he had thrown the gun, and he was then brought to the police station; there, he spoke to the police about the robbery and identified defendant and Mr. Stokes as the other men involved in the criminal activity.

## 2. The Testimony of Joan Kovacs[2]

Ms. Kovacs testified that she had been consuming alcoholic beverages at Paul Moran's house on Georgia Avenue for "a couple of hours" on the morning of the robbery. Ms. Kovacs stated that, while she was sitting with Mr. Moran in her car in front of his house, she observed a

---

[2] At the time of trial, Paul Moran (the other victim of the robbery) was unable to testify due to the fact that he was hospitalized.

"dark gray" "Nissan or Altima" enter the "next-door neighbor's yard." She further testified that she saw two "black boys wearing [black] hoods" approach the car and that she noticed that one of them had a "[s]ilver" handgun. According to Ms. Kovacs, one of those individuals went to the driver's side (where Mr. Moran was seated), while the other came to her side of the vehicle and showed her the gun. Ms. Kovacs testified that she was in fear and that, "[b]ecause of the gun," she turned over her purse, which contained between $1,000 and $2,000 in cash; upon being further questioned, she denied that there was a "tug-of-war" over the purse.

### 3. The Testimony of Kevin Perkins

Kevin Perkins, a neighbor of Paul Moran, testified that, on the morning of January 13, 2009, he had spoken with Mr. Moran and Ms. Kovacs while they were sitting in a car in front of Mr. Moran's home. It was Mr. Perkins' testimony that, as he was walking away, he observed "two kids" near a gray car parked in a neighbor's "yard." Mr. Perkins recalled that the hood of at least one of the "kids" was raised. Mr. Perkins further testified that he continued walking away and that he then observed Mr. Moran's dog chasing a young man who jumped into the back seat of the gray car as it was driving away. Mr. Perkins acknowledged that, later that day, he had been taken by the police to observe the vehicle abandoned by the suspects on Gordon Avenue, which he identified as the same gray car that he had seen the morning of the robbery.

### 4. The Testimony of Detective Stephen Gencarella

Detective Stephen Gencarella of the Providence Police Department's robbery squad testified that, on January 13, 2009, upon hearing a police broadcast that an armed robbery had occurred and that the suspects had abandoned their vehicle near the corner of Gallop Street and Gordon Avenue, he went to that area. He stated that, while canvassing the surrounding area for suspects, he observed a black male jump over a fence and begin running; he added that he

- 6 -

pursued and apprehended that person. At trial, Detective Gencarella identified defendant as being the person whom he had pursued and apprehended on the day of the robbery.

### 5. The Testimony of Officer David DePina

Officer David DePina of the Providence Police Department testified that, on February 2, 2009, having been dispatched to Narragansett Avenue, he met with a person (not previously known to him) who had come across a gun; he said that that person pointed out the gun on the sidewalk in front of 116 Narragansett Avenue. A loaded .32 caliber revolver, silver in color and with a black handle was recovered from the sidewalk. At trial, he identified the gun in photographs shown to him as the gun that had been pointed out to him at 116 Narragansett Avenue.

### D. The Motions for Judgment of Acquittal

After the prosecution rested on November 8, 2010, defendant moved, pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, for a judgment of acquittal with respect to Counts One through Five of the indictment; he based that motion on what he contended was the insufficiency of the evidence presented by the prosecution. The trial justice denied defendant's Rule 29 motion in its entirety.

Codefendant Stokes also moved pursuant to Rule 29 for a judgment of acquittal with respect to Counts One through Six of the indictment. The trial justice granted Mr. Stokes's motion in part, finding that there was insufficient evidence from which a jury could find codefendant Stokes guilty of the conspiracy charge (Count Four) beyond a reasonable doubt. The trial justice found that codefendant Stokes did not participate in any way in the robbery from Ms. Kovacs or in the assault with intent to rob of Mr. Moran. The trial justice said that, for that reason, codefendant Stokes could not be found vicariously liable for the alleged criminal conduct

of defendant or Mr. Judd as a coconspirator; and the trial justice expressly cited the leading case of Pinkerton v. United States, 328 U.S. 640 (1946). Accordingly, the trial justice granted Mr. Stokes's Rule 29 motion only with respect to Counts Two through Five, and he reduced the charge of first-degree robbery (Count One) to the lesser included charge of receiving stolen property. The trial justice denied Mr. Stokes's motion for acquittal as to Count Six, the charge of carrying a handgun without a license.

At the close of all the evidence, defendant, having opted not to present any evidence, renewed his Rule 29 motion for a judgment of acquittal. In reference to the conspiracy charge (Count Four), defendant stated that the state must prove the involvement of at least two people in a conspiracy; and defendant then argued that, in view of that principle and the fact that codefendant Stokes had been acquitted on the conspiracy count and that Mr. Judd was not charged as a coconspirator, defendant must be acquitted of the conspiracy charge. Ruling in a manner that was consistent with defendant's reasoning and citing State v. DeSanto, 603 A.2d 744 (R.I. 1992), the trial justice granted defendant's Rule 29 motion as to the conspiracy charge.

The trial justice also noted that Mr. Judd's use of a gun in the attempted robbery of Mr. Moran could not be imputed to defendant under the theory of coconspirator liability in view of the fact that Mr. Judd had not been indicted in the instant case. Accordingly, the trial justice reduced the first-degree robbery charge against defendant to that of second-degree robbery. The trial justice stated: "The case will go to the jury with regard to Mr. Gadson only as to Joan Kovacs, either as second-degree robbery or as larceny from the person."

### E. The Jury Instructions and the Ensuing Verdict

After both the prosecution and the defense had made their closing arguments, the trial justice instructed the jury as to the "Verdict Form;" he stated in pertinent part:

"[W]ith respect to Nayquan Gadson, it asks whether or not you find him guilty * * * of second-degree robbery [from] Joan Kovacs. * * * [T]hen you should ask yourselves whether or not he committed the lesser offense, as I've explained to you, of larceny from the person. There's a line for that as well. If you find [defendant] guilty of second-degree robbery, then you need not consider the issue as to whether he's guilty of the lesser included offense of larceny."

After deliberating, the jury returned to the courtroom to render its verdict. Of pertinence to this appeal, the foreman orally announced that defendant was guilty of second-degree robbery but not guilty of larceny from the person.[3]

Outside the presence of the jury, the trial justice stated that defendant was "exonerated," but the prosecutor interjected that defendant had been found guilty of second-degree robbery. At that point, the trial justice, looking at the verdict form, stated that he had "misheard [the verdict] entirely." The jury was escorted back into the courtroom, at which time the trial justice made the following statement:

"Ladies and gentlemen, I'm sorry to trouble you, but some of the lawyers and, indeed, the Court misheard the foreman's announcement as to the nature of the verdict. The prosecutors heard one thing. The defense heard another. I heard a different thing."

The trial justice had the verdict form passed back to the foreman, who stated that the verdict form accurately reflected the finding of the jury to the effect that defendant was guilty of second-degree robbery.[4] The jurors were then polled individually, and the foreman's statement was

---

[3] The jury found codefendant Stokes guilty of receiving stolen property and not guilty of unlawfully carrying a pistol without a license.

[4] The verdict form, as it was provided to the jury, reads in pertinent part as follows:

"DO YOU FIND DEFENDANT <u>NAYQUAN GADSON</u> GUILTY OR NOT GUILTY OF THE FOLLOWING OFFENSES:

unanimously confirmed. However, neither the foreman nor the individual jurors were asked to report a finding as to the charge of larceny from the person that was included on the verdict form but had been left blank. At that point, the following significant exchange took place:

> "**[Defense Counsel]**: The only thing I would add, Your Honor, is that not reflected on the jury verdict form is that Madam Clerk asked the jury foreman, as to the larceny, whether they found guilty or not guilty, and they did indicate not guilty, but we knew that was a lesser included charge, and that is not indicated or marked as to section 1(a), larceny from the person, which I don't believe is necessary in any event.

> "**[Trial Justice]**: All right. I don't know, frankly, at this point, what the court reporter's notes indicate, but, since it's a lesser included offense, he was found guilty of the second degree murder (sic), the larceny from person is of no moment. Agreed?

> "**[Defense Counsel]**: Second-degree robbery, yes, Your Honor.

> "**[Trial Justice]**: Thank you; correct. It's of no moment, correct?

> "**[Defense Counsel]**: Correct, Your Honor. I agree."

On December 9, 2011, the trial justice denied defendant's motion for a new trial. In due course, defendant was sentenced to a total of thirty years imprisonment, with twelve years to serve and the remaining eighteen years suspended, with probation. The defendant appealed to this Court.

---

1.   SECOND DEGREE ROBBERY OF JOAN KOVACS:

GUILTY_____     NOT GUILTY _____

1A. LARCENY FROM THE PERSON OF JOAN KOVACS:

GUILTY_____     NOT GUILTY _____"

We note that, after the jury had deliberated, the line on the verdict form relating to "GUILTY" with respect to the second-degree robbery charge was marked with an "X," while both the "GUILTY" and "NOT GUILTY" lines with respect to the charge of larceny from the person were left blank.

## II

## Issues on Appeal

The defendant argues that the trial justice erred: (1) in failing to dismiss the second-degree robbery charge in view of what defendant contends was a "not guilty" finding by the jury on the lesser included offense of larceny from the person; (2) in denying defendant's motion to sever Count Six, which charged codefendant Stokes (and him alone) with carrying a handgun without a license; and (3) in denying defendant's motion in limine seeking to "preclude the State from submitting or referring to: * * * any alleged connection between Gadson and the firearm used by Judd to commit the robbery."

## III

## Analysis

## A.  The Failure to Dismiss the Robbery Charge

The defendant contends that the trial judge should have dismissed the robbery charge against him after the jury foreman announced a verdict of not guilty on the lesser included charge of larceny from the person.

This Court's settled raise or waive rule "requires parties to raise an issue first in the trial court before raising it on appeal."  See, e.g., State v. Figuereo, 31 A.3d 1283, 1289 (R.I. 2011) ("This Court staunchly adheres to the 'raise or waive' rule, which requires parties to raise an issue first in the trial court before raising it on appeal."); State v. Hak, 963 A.2d 921, 927 (R.I. 2009) ("This Court's familiar raise-or-waive rule precludes us from considering issues at the appellate level that were not properly presented before the trial court."); Bouchard v. Clark, 581 A.2d 715, 716 (R.I. 1990).  A corollary principle is that this Court will not review issues that were not presented to the trial court "in such a posture as to alert the trial justice to the question

being raised." Pollard v. Acer Group, 870 A.2d 429, 433 (R.I. 2005) (internal quotation marks omitted); see also State v. Diefenderfer, 970 A.2d 12, 30 (R.I. 2009); State v. Bido, 941 A.2d 822, 828–29 (R.I. 2008).

Our review of the record reveals that defense counsel did not at any point during the colloquy that followed the jury's rendering of its verdict assert that the jury foreman's oral announcement of a not-guilty verdict on the lesser included charge of larceny from the person required acquittal on the more serious charge of second-degree robbery. The defendant seeks to raise that issue for the first time on appeal.

It is true that, after the jury had been polled individually with respect to the finding of guilt on the charge of second-degree robbery, defense counsel drew the trial justice's attention to the fact that the jury foreman had initially announced a verdict of not guilty with respect to the larceny charge whereas no such verdict was indicated on the verdict form. However, the fatal flaw in defendant's argument before this Court is that he explicitly told the trial justice that he did not believe that it was necessary that there be an indication on the verdict form of the jury's verdict concerning the charge of larceny from the person. Defense counsel went as far as to expressly agree with the trial justice that the charge of larceny from the person was "of no moment" in view of the fact that defendant had been found guilty of second-degree robbery. Accordingly, it is our view that defendant did not properly preserve this issue for appeal; therefore, we shall proceed to consider the next issue on appeal.

**B. Joinder and the Motion to Sever**

The defendant contends that he was unduly prejudiced by the joinder of Count Six, which related only to codefendant Stokes, in the same indictment with Counts One through Five, which related to both defendants. In order to evaluate defendant's contention, we look to Rule 8 and

Rule 14 of the Superior Court Rules of Criminal Procedure. See State v. Cassey, 543 A.2d 670, 673-74 (R.I. 1988); see also State v. Pereira, 973 A.2d 19, 25-28 (R.I. 2009).

We shall begin our inquiry by determining whether, as defendant asserts, it was inappropriate under Rule 8 to bring a single indictment against both defendants instead of charging them in two separate indictments. While it is not entirely clear which subsection of Rule 8 defendant contends was violated,[5] we have carefully scrutinized the record, and we perceive nothing therein that would cause us to conclude that the joinder of Count Six against codefendant Stokes with Counts One through Five against both defendants constituted a violation of either subsection. Whether viewed through the prism of Rule 8(a) or Rule 8(b), there is more than sufficient relationship between the factual basis of Count Six and the factual bases of Counts One through Five to justify their joinder as a matter of law. Accordingly, we next turn to defendant's contention that the trial justice erred in denying his motion to sever under Rule 14.[6]

Even when (as in this case) joinder under Rule 8 is proper, a defendant may nonetheless seek to show that he or she faces the possibility of being prejudiced to such an extent that relief from joinder is appropriate under Rule 14. See, e.g., Pereira, 973 A.2d at 25-28. This Court has repeatedly stated that severance under Rule 14 is "not a matter of right but rather is an issue

---

[5] Rule 8(a) of the Superior Court Rules of Criminal Procedure is entitled "Joinder of Offenses," while Rule 8(b) is entitled "Joinder of Defendants."

[6] The pertinent portion of Rule 14 of the Superior Court Rules of Criminal Procedure reads as follows:

> "If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

directed to the sound discretion of the trial justice." State v. Ashness, 461 A.2d 659, 668 (R.I. 1983); see State v. Botas, 71 A.3d 430, 433 (R.I. 2013); State v. Vanasse, 593 A.2d 58, 66 (R.I. 1991); Cassey, 543 A.2d at 673. In considering whether there is sufficient prejudice to warrant severance, the trial justice must balance "efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other." State v. Viveiros, 45 A.3d 1232, 1241 (R.I. 2012) (internal quotation marks omitted); see also Pereira, 973 A.2d at 28; State v. Day, 898 A.2d 698, 705 (R.I. 2006). Accordingly, "denial of a motion to sever will not be reversed on [appellate] review unless there has been a clear abuse of discretion." Cassey, 543 A.2d at 673; see Vanasse, 593 A.2d at 66; see also State v. Goulet, 21 A.3d 302, 309 (R.I. 2011). To prevail in an effort to show that a trial justice has abused his or her discretion in this regard, "[t]he defendant must affirmatively show that in fact he has suffered prejudice as a result of the joint trial to the extent that it has impinged upon his right to a fair trial." Cassey, 543 A.2d at 673; see Ashness, 461 A.2d at 669; State v. Gibbons, 418 A.2d 830, 835 (R.I. 1980).

In our judgment, the trial justice did not abuse his discretion in denying defendant's motion to sever. The evidence which the state needed to introduce in order to meet its burden of proof with respect to Count Six (which related to Mr. Stokes's possession of a handgun on January 12, 2009) would be easily distinguishable by a reasonable jury as being applicable only to Mr. Stokes and not to defendant. See Cassey, 543 A.2d at 674 (holding that denial of the motion to sever was not an abuse of discretion where the evidence was relatively simple and straightforward and the jury would have no significant difficulty in separating out the evidence against each defendant); see also Day, 898 A.2d at 705. Moreover, in our opinion, a charge of possession of a handgun without a license is not the type of charge that would tend to confuse

- 14 -

and mislead the jury, nor is it a charge that would cause the jurors to become more easily convinced of defendant's guilt with respect to the robbery than would be the case in the absence of such evidence. See Zafiro v. United States, 506 U.S. 534, 539 (1993) (stating that severance should be granted "only if there is a serious risk that a joint trial would * * * prevent the jury from making a reliable judgment about guilt or innocence"). In addition, and significantly, among the instructions given to the jury before it began deliberations was one that specifically instructed the jury not to let the guilt or innocence of one defendant influence its verdict with respect to the other defendant.

In addition, we are not persuaded that defendant has shown that he in fact suffered real and substantial prejudice from the joinder of Count Six to such a degree that he was denied a fair trial. See Day, 898 A.2d at 705 ("It is not sufficient for the defendant to cite the potential for and the likelihood of prejudice. His burden is to demonstrate substantial prejudice resulting from the joinder.") (emphasis in original) (internal quotation marks omitted); Ashness, 461 A.2d at 669 ("Mere allegations of potential prejudice are not sufficient. The defendant must support his motion with more than a showing of disadvantage."). We note that Mr. Stokes was ultimately acquitted of unlawfully carrying a handgun without a license. Moreover, defendant was not convicted of any crime involving a firearm since the trial justice reduced the first-degree robbery charge against him to that of the lesser included offense of second-degree robbery, which offense is statutorily defined as "robbery or other larceny from the person by force or threat, where there is no weapon and no injury * * * ." Section 11-39-1(b). In the absence of a showing of substantial prejudice or unfairness that would outweigh this Court's consideration of the trial justice's legitimate concerns for judicial economy, we perceive no basis for holding that the trial justice abused his discretion in denying defendant's motion to sever Count Six.

## C. The Motion in Limine

The defendant argues that the trial justice erred in denying his motion in limine seeking to "preclude the State from submitting or referring to: * * * any alleged connection between Gadson and the firearm used by Judd to commit the robbery." "The preliminary grant or denial of an in limine motion need not be taken as a final determination of the admissibility of the evidence referred to in the motion." State v. Torres, 787 A.2d 1214, 1220 (R.I. 2002) (internal quotation marks omitted); see also State v. Merida, 960 A.2d 228, 238 (R.I. 2008). This Court has consistently held that a failure to object "in the vital context of the trial itself (except where the in limine ruling was unequivocally definitive) [constitutes] a waiver of the evidentiary objection and [is] therefore an issue that may not be raised on appeal." State v. Andujar, 899 A.2d 1209, 1222 (R.I. 2006) (internal quotation marks omitted); see also State v. Gomes, 881 A.2d 97, 108 (R.I. 2005) ("[E]xcept when the in limine ruling is clearly definitive, it would at the very least be prudent for counsel to articulate the objection once again in the vital context of the trial itself.") (emphasis in original). In the present case, the record does not reflect that the trial justice's ruling on the defendant's motion at issue was "unequivocally definitive." Andujar, 899 A.2d at 1222. Therefore, we conclude that the defendant did not preserve this evidentiary challenge for appellate review because defense counsel did not renew his objection to the admission of the contested evidence at the trial itself.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be remanded to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Nayquan Gadson.

**CASE NO:**    No. 2011-97-C.A.
    (P1/10-683BG)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    March 13, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

    For State:  Jane M. McSoley
           Department of Attorney General

    For Defendant:  Thomas M. Dickinson, Esq.